J-S10001-25
J-S10002-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN RE: ADOPTION OF: L.A.H., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: A.H., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1746 MDA 2024 |

Appeal from the Decree Entered October 30, 2024
In the Court of Common Pleas of York County Orphans' Court at No(s):
2024-0131

| | | |
|---|---|---|
| IN THE INTEREST OF: L.H., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: A.H., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1779 MDA 2024 |

Appeal from the Order Entered October 30, 2024
In the Court of Common Pleas of York County Juvenile Division at No(s):
CP-67-DP-0000133-2023

| | | |
|---|---|---|
| IN RE: ADOPTION OF: L.A.H., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: T. W., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1747 MDA 2024 |

Appeal from the Decree Entered October 30, 2024
In the Court of Common Pleas of York County Orphans' Court at No(s):
2024-0131

J-S10001-25
J-S10002-25

IN THE INTEREST OF: L.H., A MINOR : IN THE SUPERIOR COURT OF
: PENNSYLVANIA
:
APPEAL OF: T.W., MOTHER :
:
:
:
:
:
:
: No. 1778 MDA 2024

Appeal from the Order Entered October 30, 2024
In the Court of Common Pleas of York County Juvenile Division at No(s):
CP-67-DP-0000133-2023

BEFORE: BOWES, J., OLSON, J., and SULLIVAN, J.

MEMORANDUM BY BOWES, J.:  **FILED: JUNE 16, 2025**

T.W. ("Mother") and A.H. ("Father") (collectively, "Parents") have each appealed the October 30, 2024 decrees that involuntarily terminated their parental rights to their biological son, L.H. a/k/a L.A.H. ("L.A.H."), born in February 2023. Parents have also each appealed the October 30, 2024 orders that changed L.A.H.'s permanency goal from reunification to adoption.[1] After careful consideration, we affirm the underlying termination decrees and goal change orders.

---

[1] This Court has *sua sponte* consolidated the termination and goal change cases for Mother and Father pursuant to Pa.R.A.P. 513, due to Parents having raised similar claims concerning the same factual and procedural events, and have also consolidated the respective appeals of Mother and Father for disposition. **See** Pa.R.A.P. 513 ("Where there is more than one appeal from the same order, or where the same question is involved in two or more appeals in different cases, the appellate court may, in its discretion, order them to be argued together in all particulars as if but a single appeal.").

- 2 -

We gather the relevant factual and procedural history of this matter from the certified record. Parents are not married but have been in a committed relationship for several years. The York County Office of Children, Youth & Families ("CYF") first became involved with this family after it received a General Protective Services ("GPS") report on April 14, 2023, which indicated L.A.H. had been hospitalized after suffering respiratory failure and cardiac arrest related to untreated bacterial and viral infections. ***See generally*** CYF Exhibit 1.

The GPS report also revealed that Mother had previously been indicated as a perpetrator of abuse against Parents' older biological daughter, L.H., by Perry County Children and Youth Services. ***See*** CFY Exhibit 4 at 1-2. L.H. died in May 2022 due to "medical neglect," which led to Mother being charged with, *inter alia*, endangering the welfare of a child ("EWOC") and recklessly endangering another person ("REAP") by authorities in Juniata County in February 2023. ***Id***. at 2. The report also raised concerns regarding domestic violence, unstable housing, and Father's lack of regular employment. ***See*** N.T., 10/29/24, at 146.

The same day CYF received the GPS report, the agency sought and was granted emergency protective custody of L.A.H., which was later confirmed at a shelter care hearing. On April 17, 2023, L.A.H. was transferred to the pre-

adoptive foster home of R.F. and S.H. (collectively, "Foster Parents"), where he has remained during these proceedings.[2] *Id*. at 160.

On June 26, 2023, the court adjudicated L.A.H. dependent and established his initial permanency goal as reunification with Parents. In furtherance of reunification, Parents were each directed to take part in parental education courses, maintain stable employment, obtain adequate housing, and undergo threat-of-harm assessments. *Id*. at 120-21. Additionally, Mother was ordered to resolve her pending criminal charges in Juniata County. *Id*. at 121. Finally, Parents were also directed to engage in mental health treatment. *Id*. at 28, 91.

The court held regular permanency review hearings between September 2023 and August 2024, during which time Father's compliance and overall progress was consistently found to be minimal. Mother's progress and compliance was similarly deemed to be minimal between September 2023 and March 2024. Beginning in March 2024 and continuing through August 2024, Mother's compliance and progress were found to have improved to moderate. Parents were afforded supervised visits with L.A.H. twice per week, in which they both routinely participated throughout these proceedings. *Id*. at 68-69.

_____

[2] The certified record contains several references to Foster Parents as a kinship resource, but the precise nature of Foster Parents' relationship to the family is unclear.

Parents, however, never progressed to unsupervised visits due to lack of progress with respect to their permanency objectives. *Id*. at 69.

Although Mother has been consistently employed at a local diner, we note that Father has struggled to maintain employment. *Id*. at 28-29. With respect to housing, Parents resided in either their automobile or local hotels during most of these proceedings. On August 1, 2024, Parents began a month-to-month lease on a trailer that was deemed to be appropriate for L.A.H. *Id*. at 39-40, 48-49, 59.

Parents were referred to Pressley Ridge for the majority of their remaining court-ordered services. Parents began general crisis intervention services through Pressley Ridge in April 2023, which were closed unsuccessfully in May 2023 due to Parents' refusals to engage and sporadic attendance at scheduled meetings. *Id*. at 87-88.

Pressley Ridge reopened services for Parents in July 2023, but they were unsuccessfully discharged from the parenting education program shortly thereafter due to a continued lack of engagement. *Id*. at 22-23, 89. Mother completed a parenting education program through Justice Works several months later. *Id*. at 111-12. At the time of the termination hearing, Father had enrolled in, but not completed, a similar program with Catholic Charities. *Id*. at 13-14.

Parents also engaged in mental health services through Pressley Ridge and actively participated in therapy until February 2024, when their assigned

therapist left the organization. *Id*. at 31, 90-91, 104-05. Consequently, Parents discontinued therapy through Pressley Ridge. *Id*. at 104-05. Between February 2024 and August 2024, Parents failed to obtain an alternative therapist. *Id*. at 106, 140. Ultimately, Mother had her first appointment with her new mental health provider, TrueNorth, on August 29, 2024. *Id*. at 105. By contrast, Father took no discernible action towards finding a new service provider after February 2024.

Contemporaneously, Mother entered a plea of *nolo contendere* to EWOC and REAP in Juniata County in connection with L.H.'s death. *Id*. 121-23. She was sentenced to eleven and one-half to twenty-three months of house arrest followed by three years of probation, which she began serving on July 1, 2024. *Id*. at 123. Relatedly, we note that Father has at least three prior criminal convictions for assaultive behavior.

Finally, Parents each underwent their court-ordered threat-of-harm assessments. Mother's evaluation took place between August 2023 and September 2023, which noted that Mother's "risk factors" could potentially be managed through "successful completion" of her court-ordered services. *See* CYF Exhibit 4 at 14. However, it stressed that Mother's continuing relationship with Father was "an additional risk factor" that posed a "threat of harm" to L.A.H. *Id*. at 14-15. Father completed his threat-of-harm assessment in August 2024, which largely mirrored the concerns articulated in Mother's assessment. *See* CYF Exhibit 5 at 13. Additionally, it recommended that he

participate in "outpatient domestic violence and anger management treatment" focused on violence prevention. *Id*. at 14. As of the time of the termination hearing, Father had not enrolled in any such treatment programs.

On August 8, 2024, CYF filed petitions seeking to involuntarily terminate Parents' parental rights pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), (8), and (b).[3] The same day, the agency also filed a petition requesting that L.A.H.'s permanency goal be changed from reunification to adoption.

The orphans' court held a consolidated hearing on October 29, 2024, at which time L.A.H. was approximately twenty months old. Therein, CYF adduced testimony from several employees of Pressley Ridge, including parent educator Regina Fike, family resource specialist Christina Rodriguez, visitation supervisor Jessica Weymer, and supervisor Jessica Myers; Catholic Charities family advocate and parent educator Ashley Howard; program director of Justice Works' Youth Care program Ellen Miller; and CYF caseworker Destiney Michael. Finally, the agency introduced records pertaining to L.A.H.'s dependency case. The GAL and legal counsel both opined that termination of

_____

[3] In orders filed on August 14 and August 15, 2024, the orphans' court appointed Laura Smith, Esquire, to serve as L.A.H.'s legal counsel in both the termination proceedings and the dependency proceedings. Separately, the court appointed Kelly McNaney, Esquire, to serve as L.A.H.'s guardian *ad litem* ("GAL") in both cases. Accordingly, we observe no structural error with respect to L.A.H.'s entitlement to counsel pursuant to 23 Pa.C.S. § 2313(a). *See In re Adoption of K.M.G.*, 240 A.3d 1218, 1238 (Pa. 2020).

Parents' parental rights and a change in goal from reunification to adoption was in the best interests of L.A.H.

Parents were present for the hearing and each represented by counsel. Mother testified on very limited grounds that did not touch upon the merits of the termination of her parental rights. *See* N.T., 10/29/24, at 173-76, 190-94. Father similarly offered only brief testimony, solely discussing his lack of regular employment. *Id*. at 177-79. At the conclusion of the hearing, the orphans' court detailed its findings. The next day, it entered decrees that granted CYF's petitions and involuntarily terminated Parents' parental rights, and issued orders that changed L.A.H.'s primary permanency goal from reunification to adoption.

On November 27, 2024, Parents each timely filed separate notices of appeal and concise statements of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) in the above-captioned cases. In response, the court submitted a statement pursuant to Rule 1925(a)(2)(ii) that referred to the on-the-record reasoning that it articulated at the conclusion of the October 29, 2024 hearing. *See* N.T., 10/29/24, at 199-219.

In their respective briefs, Parents have challenged the sufficiency of the evidence with respect to the court's involuntary termination of their parental

rights and the goal change orders.[4]  ***See*** Father's brief at 11-41; Mother's

brief at 24-40.  We will consider Parents' arguments in turn and will begin by

reviewing the propriety of the orphans' court's termination decrees.

Our standard of review in this context is well-established:

In cases concerning the involuntary termination of parental rights, appellate review is limited to a determination of whether the decree of the termination court is supported by competent evidence.  When applying this standard, the appellate court must accept the trial court's findings of fact and credibility determinations if they are supported by the record.  Where the trial court's factual findings are supported by the evidence, an appellate court may not disturb the trial court's ruling unless it has discerned an error of law or abuse of discretion.

An abuse of discretion does not result merely because the reviewing court might have reached a different conclusion or the facts could support an opposite result.  Instead, an appellate court may reverse for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will.  This standard of review reflects the deference we pay to trial courts, who often observe the parties first-hand across multiple hearings.

In considering a petition to terminate parental rights, a trial court must balance the parent's fundamental right to make decisions concerning the care, custody, and control of his or her child with the child's essential needs for a parent's care, protection, and support.  Termination of parental rights has significant and permanent consequences for both the parent and child.  As such, the law of this Commonwealth requires the moving party to establish the statutory grounds by clear and convincing evidence, which is evidence that is so clear, direct, weighty, and convincing as to enable a trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue.

---

[4]  On February 21, 2025, Attorney Smith, L.A.H.'s legal counsel, submitted a letter to this Court, in lieu of a brief, noting that she "concurs with the legal conclusions set forth by the trial court" and avers that the holdings below should be affirmed.  ***See*** Letter, 2/21/25.

***Interest of M.E.***, 283 A.3d 820, 829-30 (Pa.Super. 2022) (cleaned up).

The involuntary termination of parental rights is governed by § 2511 of the Adoption Act, which calls for a bifurcated analysis that first focuses upon one of eleven grounds of parental conduct that may warrant termination. ***Id.*** at 830; ***see also*** 23 Pa.C.S. § 2511(a)(1)-(11). If the orphans' court determines the petitioner has established grounds for termination under one of these subsections by "clear and convincing evidence," the court then assesses the petition pursuant to § 2511(b), which focuses upon the child's developmental, physical, and emotional needs and welfare. ***In re T.S.M.***, 71 A.3d 251, 267 (Pa. 2013). It is well-established that this Court need only agree with the court's determination as to any one subsection of § 2511(a), in addition to § 2511(b), in order to affirm. ***See In re B.L.W.***, 843 A.2d 380, 384 (Pa.Super. 2004) (*en banc*).

Based upon our review of the certified record, our analysis in this case implicates § 2511(a)(8) and (b), which provide as follows:

> **(a) General Rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> . . . .
>
> (8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

. . . .

**(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child.  The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent.  With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511.

Thus, in order to satisfy § 2511(a)(8), the petitioner must prove that: (1) the child has been removed from the parent's care for at least twelve months; (2) the conditions which led to the removal or placement still exist; and (3) termination of parental rights would best serve the needs and welfare of the child.  ***See In re Adoption of J.N.M.***, 177 A.3d 937, 943 (Pa.Super. 2018).   This subsection does not necessitate an evaluation of a parent's willingness or ability to remedy the conditions that led to the removal of the child.  ***See In re M.A.B.***, 166 A.3d 434, 446 (Pa.Super. 2017).  Rather, our inquiry is focused upon whether the at-issue "conditions" have been "remedied" such that "reunification of parent and child is **imminent** at the time of the hearing." ***In re I.J.***, 972 A.2d 5, 11 (Pa.Super. 2009) (emphasis added).  It is axiomatic that "a child's life cannot be held in abeyance while the parent is unable to perform the actions necessary to assume parenting responsibilities.  We cannot and will not subordinate indefinitely a child's need

for permanence and stability to a parent's claims of progress and hope for the future." *Id.* at 11-12 (cleaned up).

Finally, this Court has also explained:

[W]hile both [§] 2511(a)(8) and [§] 2511(b) direct us to evaluate the "needs and welfare of the child," we are required to resolve the analysis relative to [§] 2511(a)(8), prior to addressing the "needs and welfare" of [the child], as proscribed by [§] 2511(b); as such, they are distinct in that we must address [§] 2511(a) before reaching [§] 2511(b).

*In re Adoption of C.L.G.*, 956 A.2d 999, 1009 (Pa.Super. 2008) (*en banc*).

Preliminarily, there is no dispute that the first factor of § 2511(a)(8) has been established in Parents' cases. As noted above, L.A.H. was removed from Parents' care on April 14, 2023. Therefore, at the time of the termination hearing on October 29, 2024, L.A.H. had been removed from Parents' care for over eighteen months, *i.e.*, more than twelve months.

Turning to the second element of § 2511(a)(8), the orphans' court's on-the-record analysis exhaustively reviewed and detailed the factual evidence adduced by CYF at the termination hearing. *See* N.T., 10/29/24, at 199-218. Overall, the court expressed that it still harbored significant "safety concerns" regarding Parents' ability to care for L.A.H. *Id*. at 215. Although it acknowledged that Mother made partial progress on some of her individual goals, the court nonetheless concluded that Parents had not "progressed to appropriately alleviate the circumstances which necessitated . . . the removal of their child from their care." *Id*. at 215-16. Our review reveals that the certified record fully supports the findings of the orphans' court.

- 12 -

Ms. Michael and Ms. Rodriguez each testified that L.A.H. was removed from Parents' care due to lack of housing, inadequate employment, domestic violence, mental health issues, and critical concerns regarding Parents' protective capacity. *Id*. at 28, 120-21. Our review indicates that Parents had not fully resolved these concerns at the time of the termination hearing.

For the majority of these proceedings, the certified record uniformly indicates that Parents did not have appropriate housing and were living out of their car or in local hotels. Ms. Rodriguez testified that Parents obtained housing beginning on August 1, 2024. *See* N.T., 10/29/24, at 48-49, 59. She explained, however, that Parents' lease only provided for month-to-month lodging. *Id*. at 39-40, 48-49. In its findings, the orphans' court noted that this lack of stability and permanence was a point of concern that undermined Parents' purported completion of their housing objective: "The [c]ourt is also concerned that it is [a] month-to-month lease and not a six month or even a one year lease to be able to establish that housing is a long term appropriate place for reunification." *Id*. at 212.

Along similar lines, Parents were only partially successful in complying with their objectives regarding employment. While Ms. Rodriguez reported that Mother had maintained steady employment at a local diner during these proceedings, she reported that Father had failed to similarly maintain steady employment. *Id*. at 28-29. Specifically, she averred that Father lost his most

recent job on July 31, 2024, and remained unemployed as of the October termination hearing. *Id*. at 29.

The certified record also reveals that there were still lingering issues regarding domestic violence in Parents' relationship. Specifically, Ms. Michael's testimony noted that domestic violence concerns were raised in the initial referral that CYF received in April 2023. *Id*. at 146. There were indications in the certified record that Parents were involved in a physical altercation while visiting L.A.H. during his hospitalization. *See* CYF Exhibit 4 at 3 ("Concerns were noted due to reports of witnessed domestic violence perpetrated by [Father] towards [Mother] while they were in the hospital visiting [L.A.H.]. It was reported that [Father] had been observed pushing [Mother]."). The orphans' court credited this information. *See* N.T., 10/29/24, at 214-15. Furthermore, Father's threat-of-harm assessment recommended that he participate in outpatient treatment to address his unresolved problems with violence and anger. *See* CYF Exhibit 5 at 14. Father, however, neglected to pursue any such treatment prior to the termination hearing in October 2024.

Turning to Parents' mental health troubles, Ms. Rodriguez testified that Parents began participating in therapy through Pressley Ridge shortly after the organization reopened services with them in July 2023. *Id*. at 31, 90-91, 104-05. However, Parents discontinued therapy through Pressley Ridge in February 2024 after their assigned therapist left the organization. *Id*.

Between February 2024 and the filing of the termination petition in August 2024, Parents did not obtain an alternative therapist.[5]  *Id*. at 106, 140.

Ms. Michael noted that this lapse was the result of Parents' lack of "motivation to get things completed," which was an "ongoing theme" in these cases.  *Id*. at 141-42.  During this time period, Parents did not request the appointment of a new therapist through CYF or Pressley Ridge.  *Id*.  While Parents' failure to secure a new therapist was troubling, Ms. Michael emphasized Parents' inability to address problems in a timely fashion was the larger issue:  "[T]hat complacency that we've seen with other services throughout the case that is the concern.  So it's not so much the lapse in therapy itself, while that is important, it's the way that it was handled that is the bigger concern."  *Id*. at 142.

With respect to CYF's concerns regarding L.A.H.'s safety and Parents' protective capacity, we emphasize that L.A.H. was removed from Parents' care immediately after being hospitalized while near death from untreated infections.  *See generally* CFY Exhibit 1.  These circumstances were distressingly similar to L.H.'s death, which was a result of medical neglect.

---

[5]  As noted earlier, Ms. Meyers testified that Mother had her first appointment with a new mental health provider, TrueNorth, on August 29, 2024.  *Id*. at 105.  Critically, § 2511(b) provides that in assessing the propriety of termination pursuant to § 2511(a)(8), Pennsylvania courts "shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition." 23 Pa.C.S. § 2511(b).  Given that CYF gave notice of the filing of the petition on August 8, 2024, we are precluded from considering this evidence.

*See* CFY Exhibit 4 at 1-2. Despite the extreme nature of these events, Parents' threat-of-harm assessments indicated that they disclaimed responsibility for the circumstances that caused L.H.'s death and L.A.H.'s removal. *See generally* CYF Exhibits 4-5. Parents also expressed their belief that CYF's involvement in their lives was unwarranted. *Id*.

Collectively, the witnesses who testified at the termination hearing expressed concern regarding Parents' ability to function as a unit and the viability of their relationship. Indeed, the certified record reveals that CYF's witnesses described strikingly identical concerns about returning L.A.H. to the care of each Parent due to the lack of progress detailed above. While Mother displayed more dedication with respect to her court-ordered objectives, she refused to break off her relationship with Father despite his complacency and lack of progress. Ms. Rodriguez explained that Father's refusal to engage with his court-ordered services was a significant and ongoing obstacle to Parents' overall progress towards reunification. *See* N.T., 10/29/24, at 35-36. Ms. Rodriguez testified that she had explained to Mother on multiple occasions that her relationship with Father was "hindering" the chances of L.A.H. being returned. *Id*. at 36. Ms. Rodriguez indicated, however, that Mother was unwilling to take any action to discontinue her association with Father. *Id*. at 36-38.

These concerns were echoed by Ms. Myers, who testified that Parents had not successfully improved their ability to co-parent, largely as a result of

Father's lack of engagement and improvement. *Id*. at 93-94. Ms. Myers averred that this disparity in Parents' relationship and their inability to move past it was a significant point of concern, as follows:

> [T]he inability to move forward where [they were facing] losing custody of a child and remaining in a relationship that was not healthy and supportive for unified goals is a co-parenting concern. While they were doing well in the visits there appeared to be some stress related to the lack of equal sharing of responsibilities and that stress continued to manifest beyond those supervised visits.

*Id*. at 95. Irrespective of Mother's moderate progress, Ms. Myers testified "[b]ecause [Parents] are in a relationship and tend to move forward as a whole unit, therefore, Mother is tied to Father's progress or lack thereof." *Id*. at 97.

Ms. Michael further explained that Father's unwillingness to cooperate with court-ordered services and address his own problems also impacted Mother: "It's a barrier for Mother, if she continues to remain in a relationship with Father by her own choice while being aware of the concerns and the unwillingness to participate in services." *Id*. at 150. Despite raising these concerns with Mother on a regular basis between January 2024 and October 2024, Ms. Michael reported that Mother took no action to extricate or distance herself from her relationship with Father. *Id*. at 150. Furthermore, Ms. Michael averred:

> It calls into concern Mother's ability to make proactive decisions as it relates to [L.A.H.] and the child's care. This is a case where we do have a history of indicated child abuse and a prior fatality related to medical neglect which is documented to have stemmed from a lack of medical care for that specific child, which could be perceived to be a lack of action by the part of the parents.

*Id*. at 151. Despite Mother's arguable progress with respect to certain aspects of her court-ordered services, Ms. Michael testified that Parents' complacency and Mother's continued relationship with Father led the agency to still harbor significant concerns regarding their protective capacity, decision-making, and ability to safely meet L.A.H.'s needs. *Id*. at 152.

Upon review of the certified record, we discern no error of law or abuse of discretion in the finding of the orphans' court that the second prong of § 2511(a)(8) has been satisfied.

Turning to the third and final prong of § 2511(a)(8), we must consider whether termination of Parents' rights would best serve L.A.H.'s needs and welfare. As detailed in our analysis above, the respective testimonies of Ms. Rodriguez, Ms. Myers, and Ms. Michael all noted significant safety concerns regarding Parents' basic ability to care for L.A.H. *Id*. at 35-38, 93-97, 150-52. Additionally, Ms. Weymer testified that Mother's continued relationship with Father raised significant questions regarding Mother's "protective capacity." *Id*. at 75. These concerns are corroborated by the unfortunate events surrounding the death of L.H. due to medical neglect, as well as the circumstances of L.A.H.'s own hospitalization in April 2023. On the whole the evidence of record strongly indicates that Parents collectively lack the necessary dedication, perspective, and skills to adequately care for L.A.H.

Based upon the foregoing analysis, we find no abuse of discretion or error of law in the conclusion of the orphans' court that involuntary

termination of Parents' parental rights was warranted pursuant to § 2511(a)(8).

Since the record supports the court's conclusion that adequate grounds for termination existed pursuant to at least one subsection of § 2511(a), we now turn to a review of the court's findings pursuant to § 2511(b), which gives "primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S. § 2511(b); *see also T.S.M.*, 71 A.3d at 267. We remain mindful that "the determination of the child's particular developmental, physical, and emotional needs and welfare must be made on a case-by-case basis," with an eye towards "each child's specific needs." *Interest of K.T.*, 296 A.3d 1085, 1105-06 (Pa. 2023). This inquiry is neither formulaic, nor mechanical. *Id*.

Our review must include consideration of the bond between the parent and the child. *See In re E.M.*, 620 A.2d 481, 485 (Pa. 1993). Our Supreme Court has explained, however, that "only a necessary and beneficial" parental bond should be maintained. *K.T.*, 296 A.3d at 1009. A bond is considered to be "necessary and beneficial" if its severance would cause extreme emotional consequences or significant, irreparable harm. *Id*. at 1109-10. The extent of the "bond-effect analysis necessarily depends on the circumstances of the particular case." *In re Adoption of J.M.*, 991 A.2d 321, 324 (Pa.Super. 2010) (cleaned up). Therefore, it is "within the discretion of the orphans' court to prioritize the safety and security" of children "over their bonds with

their parents[.]" *M.E.*, 283 A.3d at 839 (cleaned up). Courts should also consider "whether the children are in a pre-adoptive home and whether they have a bond with their foster parents." *K.T.*, 296 A.3d at 1106. Finally, we note that a child's "emotional needs and welfare include intangibles, such as love, comfort, security, and stability." *Id*.

Here, the orphans' court concluded "there is a parental bond of some level between [L.A.H.] and [Parents]." N.T., 10/29/24, at 216-17. Based upon the entirety of the evidence, however, the court found that the "strongest parental bond" exists between L.A.H. and Foster Parents, who have cared for L.A.H. for virtually the entirety of his young life. *Id*. at 217. Thus, the court found that "while there is some level of a positive parental bond between [Parents] and [L.A.H.], that . . . bond does not justify" denial of CYF's petitions to terminate. *Id*. In other words, the court held that "there would be no long term, negative impact on the minor child as a result" of termination. *Id*.

As above, our review confirms that the certified record amply supports the conclusions of the orphans' court. First, we acknowledge Ms. Rodriguez's testimony that L.A.H. was affectionate and happy during his supervised interactions with Parents. *Id*. at 47-48. Similarly, Ms. Weymer averred that visits between Parents and L.A.H. were generally positive. *Id*. at 78-81. In reaching its stated conclusion, however, the orphans' court credited the testimony of Ms. Michael, who averred that L.A.H.'s primary parental bond

was with Foster Parents and that termination was in L.A.H.'s best interests to allow him permanency, as follows:

> Q. Why would termination of Mother and Father's parental rights be in the best interest of [L.A.H.]?
>
> A. I would just repeat my prior testimony, that [L.A.H.] has been in . . . his current [k]inship resource home for approximately [eighteen] months, a majority of his life as an infant and now as a young toddler. **This is the home that he has known and the agency would feel that it is in his best interest to have permanency with this family.**

*Id*. at 160 (emphasis added).

Along those lines, Ms. Michael also testified that L.A.H. has established a close and affectionate bond with Foster Parents and opined that L.A.H. is "too young to comprehend" the termination of Parents' rights. *Id*. at 160-61, 164-65. Ms. Michael stated that L.A.H. refers to Foster Parents as "mom" and "dad" and is fully and happily integrated into Foster Parents' family. *Id*. Finally, her testimony indicated that L.A.H. was developmentally "on target" and "doing very well" under Foster Parents' pre-adoptive care. *Id*. at 161.

Based upon the foregoing discussion, we observe no abuse of discretion or error of law in the holding of the orphans' court that involuntary termination of Parents' parental rights as to L.A.H. was also warranted pursuant to § 2511(b). Since the court's termination findings are supported by sufficient and competent evidence as detailed above, we affirm the underlying decrees.

Next, Parents both raise challenges to the dependency court's entry of the orders changing L.A.H.'s permanency goal to adoption. *See* Father's brief

at 38; Mother's brief at 11. At bottom, they contend that the goal change was inappropriate given their progress towards reunification. **See** Father's brief at 38-39; Mother's brief at 27-28.

Although Parents are no longer aggrieved by the goal change orders now that we have affirmed the decrees terminating their parental rights, we address the challenges to that order out of an abundance of caution.[6] This Court "review[s] goal-change orders pursuant to an abuse-of-discretion standard of review. As such, we must accept the trial court's findings of fact

_____

[6] This Court has often relied upon our alternative analysis in **Interest of D.R.-W.**, 227 A.3d 905, 917 (Pa.Super. 2020), wherein we concluded, without explanation, that a parent's appeal from a goal change order was moot once we affirmed the related termination decree. **See e.g.**, **In re Adoption of A.H.**, 247 A.3d 439 (Pa.Super. 2021) (citing **Interest of D.R.-W.** for the proposition that "the effect of [the] decision to affirm the orphans' court's termination decree necessarily renders moot the dependency court's decision to change Child's goal to adoption" (cleaned up)).

However, the principle gleaned from **Interest of D.R.-W.** is an imprecise declaration regarding a parent's continued standing to challenge dependency-related issues after this Court affirms an involuntary termination decree. It is axiomatic that "[a]n issue before a court is moot if in ruling upon the issue the court cannot enter an order that has any legal force or effect." **M.B.S. v. W.E.**, 232 A.3d 922, 927 (Pa.Super. 2020) (cleaned up). Notwithstanding the involuntary termination of parental rights, this Court can enter an order that has legal force and effect as to the goal change because the child is still dependent and the goal change still governs the permanent placement goal. For example, if a juvenile court changes a goal from reunification to adoption in association with terminating a parent's parental rights, an issue challenging the goal change to adoption is never moot because the goal change to adoption may not be in the child's best interest. In such a case, we can enter an order that has legal force or effect because we can vacate the goal change and direct that the court consider any of the remaining alternative placements. Therefore, we address the challenge to the goal change on the merits.

and credibility determinations if the record supports them, but we need not accept the court's inferences or conclusions of law." ***Interest of D.R.-W.***, 227 A.3d 905, 917 (Pa.Super. 2020) (cleaned up).

> We have explained our deferential examination in this regard: Not only are our trial judges observing the parties during the hearing, but usually they have presided over several other hearings with the same parties and have a longitudinal understanding of the case and the best interests of the individual child involved. Thus, we must defer to the trial judges who see and hear the parties and can determine the credibility to be placed on each witness and, premised thereon, gauge the likelihood of the success of the current permanency plan. Even if an appellate court would have made a different conclusion based on the cold record, we are not in a position to reweigh the evidence and the credibility determinations of the trial court. We are not bound by the trial court's legal conclusions.

> Placement goals are governed by the Juvenile Act, 42 Pa.C.S. §§ 6301-65. Section 6351 of the Juvenile Act directs that a juvenile court not only consider the appropriateness and feasibility of a child's current goal during the permanency review hearings, it also mandates that the court enter an order addressing whether to continue, modify or terminate placement. Thus, a goal change may occur as a result of a petition by the responsible agency, or *sua sponte* by the trial court during its mandatory review of the dependency matter. Regardless of the starting point, we have outlined the analysis a trial court must undertake when modifying a child's permanent placement goal as follows: The policy underlying the Juvenile Act is to prevent children from languishing indefinitely in foster care, with its inherent lack of permanency, normalcy, and long-term parental commitment. Consistent with this underlying policy, the focus of dependency proceedings, including change of goal proceedings, is on the child. Safety, permanency, and well-being of the child must take precedence over all other considerations, including the rights of the parents.

> Pursuant to 42 Pa.C.S. § 6351(f) of the Juvenile Act, when considering a goal change for a dependent child, the juvenile court is to consider, *inter alia*: (1) the continuing necessity for and appropriateness of the placement; (2) the extent of compliance with the family service plan; (3) the extent of progress made

- 23 -

towards alleviating the circumstances which necessitated the original placement; (4) the appropriateness and feasibility of the current placement goal for the children; (5) a likely date by which the goal for the child might be achieved; (6) the child's safety; and (7) whether the child has been in placement for at least fifteen of the last twenty-two months. The best interests of the child, and not the interests of the parent, must guide the trial court.

Additionally, the court must determine whether reasonable efforts were made to finalize the permanency plan in effect and whether the current caregiver is providing the child with regular, ongoing opportunities to participate in age-appropriate or developmentally appropriate activities. Although we have held that parental progress toward completion of a permanency plan is an important factor, it is not to be elevated to determinative status, to the exclusion of all other factors. Ultimately, a child's life simply cannot be put on hold in the hope that the parent will summon the ability to handle the responsibilities of parenting.

*Interest of K.C.*, 319 A.3d 596, 599–601 (Pa.Super. 2024) (cleaned up).

Here, the orphans' court determined that CYF met their burden for the court to change L.A.H.'s concurrent goal of reunification with that of adoption, and to change the secondary concurrent goal to permanent legal custodian, relative. Our review of the record confirms the court's findings underpinning this conclusion. Specifically, although L.A.H. has a bond with Mother and Father, he is also bonded to his Foster Parents, who have cared for him since he was two months old. Indeed, he has spent the majority of his infancy and toddlerhood with Foster Parents. Given the length of the dependency placement and L.A.H.'s strong bond to pre-adoptive Foster Parents, CYF sought to change L.A.H.'s goal to adoption and opined that doing so is "in his best interest to achieve permanency and have stability within that [resource] home." N.T., 10/29/24, at 156. Additionally, the evidence bore out that

although Mother and Father had secured an acceptable home, they were not otherwise immediately able to resume custody of L.A.H., and no date could be given when they would be given their lack of compliance with court-ordered services. *Id*. at 156-58. Under these circumstances, we conclude that the orphans' court did not abuse its discretion in deciding that a goal change to adoption was in the best interests of L.A.H.

Accordingly, we affirm the decrees terminating the parental rights of Mother and Father as to L.A.H., as well as the orders changing L.A.H.'s goal to adoption.

Decrees affirmed. Orders affirmed.


Judgment Entered.


Benjamin D. Kohler, Esq.
Prothonotary


Date: <u>6/16/2025</u>